UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: ) | |
| ) | |
| ADAM S. KELLY and ) | Case No. 6:12-bk-05288-KSJ |
| LISA A. KELLY, ) | Chapter 7 |
| ) | |
| Debtors. ) | |
| ) | |
| | |
| ADAM S. KELLY and ) | |
| LISA A. KELLY, ) | |
| ) | Adversary No. 6:12-ap-00102-KSJ |
| Plaintiffs, ) | |
| vs. ) | |
| ) | |
| MICHIGAN FINANCE AUTHORITY – ) | |
| STUDENT LOAN PROGRAMS, et. al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**MEMORANDUM OPINION DENYING
<u>PLAINTIFFS' RELIEF SOUGHT UNDER 523(a)(8)</u>**

Plaintiffs, Adam and Lisa Kelly, borrowed more than $160,000 from the Defendants to fund their educations.[1] They now seek to discharge their student loans under § 523(a)(8) of the Bankruptcy Code[2] arguing the debt imposes an undue hardship on them and their dependents.[3] All of the Defendants, National Collegiate Trust ("NCT"), Educational Credit Management Corporation ("ECMC"), Michigan Finance Authority ("MFA"), and the U.S. Department of

---

[1] Doc. No. 15 at ¶ 10. Plaintiff Adam Kelly borrowed $28,000 from Defendant National Collegiate Trust (assignee of Bank One, N.A.) and $70,227 from Defendant Michigan Finance Authority. Doc. No. 51. Plaintiff Adam Kelly also borrowed $17,417 in principal from Defendant Educational Credit Management Corporation (a federally guaranteed loan). *Id*. Plaintiff Lisa Kelly borrowed $53,500 from Defendant U.S. Department of Education. Doc. No. 64, Exhibit 1.
[2] All references to the Bankruptcy Code shall be to 11 U.S.C. § 101 *et seq*.
[3] Doc. Nos. 1, 56.

Education ("DOE"), object contending the Plaintiffs have not demonstrated a hardship discharge because they have not satisfied the requirements of the applicable Brunner Test.[4] Defendants specifically contend the Plaintiffs have shown no undue hardship because they have not minimized their expenses or proven they cannot repay the loans in the future as their incomes increase. The Court although sympathetic to the Plaintiffs' current financial plight concludes no undue hardship exists that precludes the Plaintiffs from paying their student loans.

Plaintiff Adam Kelly obtained a Bachelor of Fine Arts degree with a concentration in Digital Cinema from the College for Creative Studies in May 2005, which was the last year he received a student loan.[5] WJRT-TV, an ABC-affiliated station in Michigan, has employed Mr. Kelly since June 2005.[6] He currently works remotely from his home in Florida.[7]

Plaintiff Lisa Kelly obtained a Bachelor of Science degree with a concentration in Elementary Education from Western Michigan University in December 2004.[8] She was employed as a teacher at various schools in the Flint, Michigan area from 2006-2011.[9] Due to budgetary difficulties within the Flint Community School District, Mrs. Kelly repeatedly was laid off at the end of each school year, which resulted in the Plaintiffs losing their health insurance each summer.[10] In 2008, she obtained a Masters of Art degree in Special Education from the University of Michigan-Flint[11] in an effort to gain more permanent employment, but was unsuccessful.[12]

---

[4] Doc. Nos. 35, 40.
[5] *Id*. at 2.
[6] *Id*.
[7] *Id.* at 12.
[8] *Id*. at 2; Doc. No. 65, Exhibit 3.
[9] Doc. No. 51.
[10] Doc. No. 56 at 11.
[11] *Id*. at 2; Doc. No. 65, Exhibit 3.
[12] Doc. Nos. 56 at 2 and 11.

Plaintiffs then moved to Florida to secure more stable income.[13] Mrs. Kelly now works at Horizons Elementary in Polk County, Florida.[14] She started this job in 2011, shortly after moving to Florida.[15]

Plaintiffs have earned more than $70,000 annually since 2007.[16] Their combined educational loan debt currently exceeds $160,000:[17]

1) Mr. Kelly owes $11,955.45 to Defendant ECMC.
2) Mr. Kelly owes $29,722.26 to Defendant NCT.
3) Mr. Kelly owes $86,217.81 to Defendant MFA.
4) Mrs. Kelly owes $40,151.43 to Defendant DOE.

Prior to filing for bankruptcy, the Plaintiffs had monthly student loan payments totaling $1,234.[18] They have paid a total of $76,094.88 towards their student loans since 2002.[19] As their combined income increased over the years, the Plaintiffs contributed more toward their student loans. The Court specifically finds that the Plaintiffs have made a good faith attempt to repay their student loans.

The Plaintiffs have two dependents: 3-year-old Galvin and 18-month-old Noah.[20] While Galvin is in day care,[21] Mr. Kelly works from home and takes care of Noah,[22] who suffers from spina bifida, a birth defect in which the backbone and spinal canal do not close before birth.[23]

---

[13] Doc. No. 51.
[14] *Id.*; Doc. No. 56 at 11.
[15] Doc. No. 51.
[16] The Plaintiffs indicated that they file a joint tax return. Doc. 65, Exhibit 2. The Plaintiffs' Adjusted Gross Income, as stated on their tax returns, was $71,169 in 2007; $76,486 in 2008; $83,382 in 2009; $76,610 in 2010; $71,291 in 2011; and $77,606 in 2012. Doc. No. 56 at 6.
[17] Doc. No. 51.
[18] Doc. No. 56 at 3 ($267 to DOE; $46 to ECMC; $250 to NCT; and $671 to MFA).
[19] *Id.* at 6 ($13,838.76 to DOE; $10,337.21 to ECMC; $31,910.94 to MFA; and $20,007.97 to NCT). The Plaintiffs made total payments of $396.46 in 2002; $2,628.46 in 2003; $1,261.44 in 2004; $699.72 in 2005; $4,316.80 in 2006; $6,324.96 in 2007; $10,636.33 in 2008; $14,154.65 in 2009; $14,849.41 in 2010; $15,572 in 2011; and $4,884.28 in 2012. *Id.* at 3-5.
[20] Doc. No. 51.
[21] The Plaintiffs testified that Mrs. Kelly takes care of Galvin during the summer when she is not teaching. Therefore, Galvin only is in day care for approximately nine months of the year.
[22] Doc. No. 56 at 9 & 12.
[23] *Id.* at 9.

Noah also was diagnosed with hydrocephalus, a buildup of fluid inside the skull that leads to brain swelling.[24]

Noah must see health care professionals routinely;[25] and the attendant medical costs are unpredictable and expensive. Noah already has undergone two corrective surgeries, including one on the day of his birth, although neither was successful in curing either disability.[26] The Plaintiffs cannot predict how many more procedures Noah will need in the future.[27] Although insurance covers a large portion of Noah's medical bills, the Plaintiffs still pay 20% of the cost of Noah's procedures and a $40 copayment each medical visit.[28]

The Plaintiffs have tried to maximize their income and, to some degree, reduce their living expenses. Mrs. Kelly received a raise from the Polk County School Board after she earned a Master's degree.[29] Mrs. Kelly also tutors students, which provides an extra $145 per month.[30] The Plaintiffs receive a discount on their automobile and renter's insurance policies because Mrs. Kelly is a teacher,[31] and they use the more fuel-efficient car as much as possible.[32] Although the Florida home is larger than their former home in Michigan,[33] the new home costs only $50 more per month.[34] Mr. Kelly no longer has to work out of his son's bedroom, and Noah can receive needed water-based therapy in their home pool.[35]

---

[24] *Id.*
[25] Doc. No. 64, Exhibit 10.
[26] Doc. No. 56 at 10.
[27] *Id.*
[28] The Plaintiffs try to see as many doctors in one visit as possible to minimize their travel, however, doing so results in copayments of as much as $160 per visit (each copayment corresponds to only one doctor). *Id.*
[29] Doc. No. 56 at 9; Doc. No. 65, Exhibit 3.
[30] Doc. No. 56 at 11.
[31] *Id.* at 7.
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.* at 7.

The Plaintiffs contend they have exhausted every option to lower their payments by seeking forbearances, deferments, and consolidating their loans into the Direct Ford Program.[36] Mrs. Kelly also has obtained forgiveness of a portion of her loans by working with disabled students in low-income areas for five years.[37]

On April 20, 2012, the Plaintiffs filed this Chapter 7 bankruptcy case because they were no longer able to manage their overwhelming credit card, medical, and student loan debts.[38] In this adversary proceeding, they seek to discharge the student loans they owe to the Defendants under § 523(a)(8) of the Bankruptcy Code alleging repayment would cause an undue hardship.

Generally, student loans are not dischargeable. Under § 523(a)(8), a debtor is not entitled to a discharge of a student loan debt "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." Absent a showing of undue hardship, the debtor's student loan obligations are not dischargeable.[39]

Plaintiffs bear the burden of proving beyond a preponderance of the evidence that an ongoing and permanent undue hardship will prevent them from paying their student loans.[40] Unless a debtor is able to meet all three prongs of the following Brummer Test, adopted by the Eleventh Circuit Court of Appeals, a debtors student loan debt is not dischargeble:

> (1) The Debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;
> (2) Additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
> (3) The Debtor has made good faith efforts to repay the loans.[41]

---

[36] *Id*. at 12.
[37] *Id*.
[38] *Id*. at 6; Case No. 12-bk-05288-KSJ.
[39] *In re Cox*, 338 F.3d 1238, 1243 (11th Cir. 2003) (holding "a debtor cannot obtain a discharge of student loan indebtedness without a finding of "undue hardship").
[40] *In re Matthews-Hamad*, 377 B.R. 415, 420 (Bankr. M.D. Fla. 2007).
[41] *Id*.

"If one of the elements of the test is not proven, the inquiry ends, and the student loan cannot be discharged."[42] A finding of undue hardship is an incredibly high hurdle to overcome.[43] Debtors must prove more than just a "garden variety" of hardship to discharge a student loan.[44]

The Plaintiffs argue they meet all three prongs of the Brunner Test because: (1) they have maximized their employment potential within their chosen fields and have minimized their expenses, (2) their son's medical bills will create future financial distress, and (3) they already have paid more than $76,000 towards their student loans.[45]

The Defendants argue these Plaintiffs have failed to prove undue hardship. They primarily contend that the Plaintiffs' current standard of living far exceeds a "minimal standard," that the Plaintiffs can do more to reduce expenses, that they have more income than they have disclosed, and that their present difficult financial situation will not last for the duration of the repayment period.[46]

The first prong of the Brunner Test requires a debtor to demonstrate she cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if she were forced to repay the loans.[47] Courts may take into consideration a debtor's particular circumstances, including all sources of income, expenses, and any available debt-restructuring options.[48] A debtor is not required to live in poverty, but may not necessarily

---

[42] *In re Russotto*, 370 B.R. 853, 856 (Bankr. S.D. Fla. 2007); *In re Southard*, 337 B.R. 416, 420 (Bankr. M.D. Fla. 2006).
[43] *In re Cox*, 338 F.3d at 1238 (describing how the bankruptcy laws have evolved over time to limit a debtor's ability to discharge student loan debt).
[44] *In re Brosnan*, 323 B.R. 533, 538 (Bankr. M.D. Fla. 2005).
[45] Doc. No. 56 at 6, 9, 11, and 12.
[46] Doc. Nos. 10, 20, and 58; The Court overrules Defendant ECMC's objection that the Plaintiffs have not made a good faith attempt to repay their student loans. The fact that the Plaintiffs have paid over $76,000 towards the loans is more than sufficient to establish good faith.
[47] *In re Cox*, 338 F.3d at 1242.
[48] *In re Matthews-Hamad*, 377 B.R. at 421.

maintain her previous standard of living.[49] "A minimal standard of living is demonstrated by modest and reasonable expenses."[50]

The Court finds that the Plaintiffs have failed to demonstrate they have minimized their living expenses to maximize the resources available to repay their student loans. Their income is understated. Their expenses are overstated. Although the Plaintiffs are not required to live in poverty, they have failed to adjust their lifestyle sufficiently to demonstrate undue hardship.[51]

The Plaintiffs' combined income is understated. They claim their current combined average monthly net income is $4,695.92,[52] which does not reflect $2,117 in tax refunds received during the last year.[53] Further, Mr. Kelly understated his income by $192 per paycheck,[54] and mistakenly calculated his income based on a 24-week (as opposed to a 26-week) year.[55] The Plaintiffs' actual monthly income is $5,449.12, and there is no reason why the Plaintiffs should not expect future increases in income.

---

[49] *Id.* (citing *Credit Mgmt. Corp. v. Stanley*, 300 B.R. 813, 818 (N.D. Fla. 2003)).
[50] *In re Vuini*, 6:11-BK-07559-KSJ, 2012 WL 5554406, at *4 (Bankr. M.D. Fla. Nov. 14, 2012).
[51] *In re Bush*, 450 B.R. 235, 241 (Bankr. M.D. Ga. 2011) ("Some level of sacrifice is required in order to stay current on [student loan] payments. A debtor is not required, however, to sacrifice in such a degree that the debtor and/or debtor's dependents are cast into an existence where some minimal standard of living cannot be obtained.").
[52] Doc. No. 56 at 9. Although both Plaintiffs admit to having recently received a small raise, Mr. Kelly claims his raise was more than offset by a concurrent increase in taxes and health insurance. *Id.*
[53] Trial on the Plaintiffs' Amended Complaint, June 10, 2013 (Federal Income Tax Refund of $1,331 + Michigan Income Tax Refund of $786). This works out to an additional $176.42 per month ($2,117 divided by 12 months).
[54] Mr. Kelly neglected to add back a $192 paycheck deduction for a Flexible Spending Account which he uses to pay for medical and day care expenses. *Id.*
[55] Doc. No. 58 at 3. This results in a net increase in Mr. Kelly's monthly income of $160.76: ($2,088.67 ($964 per paycheck multiplied by 26 paychecks, divided by 12 months) − $1,928 ($964 per paycheck multiplied by 2 paychecks).

The Plaintiffs' expenses are overstated. Plaintiffs list their current average monthly expenses[56] as $4,740.[57] This figure overstates day care expenses by $150 per month because Mrs. Kelly stays home to take care of their son, Galvin, during the summer.[58] By the Plaintiff's own estimates, their monthly expenses are $4,590, leaving them $859.12 per month to pay toward their student loan debt. Adding a monthly student loan payment of $1,234, the Plaintiffs would need to reduce their expenses by only $374.88 per month to pay their student loans <u>*in full*</u>.

The Court agrees with the Defendants that the Plaintiffs' discretionary spending is subject to reduction by at least $400 per month, enough to pay their student loans in full. The Brunner Test serves to promote the financial integrity of student loan programs "by not permitting debtors . . . to dismiss their obligation merely because repayment of the borrowed funds would require some major personal and financial sacrifices."[59] Here, the Plaintiffs have recently traveled to Michigan over the holidays, to Miami twice in February,[60] and to Clearwater in March to visit with family. Reducing these types of trips would help minimize their gas expenses and other travel-related costs. Given that Mr. Kelly works at home and that much of the Plaintiffs' gas costs are associated with these trips, the Court finds gas costs of $200 per month is reasonable, as opposed to the $400 per month estimated by the Plaintiffs.

---

[56] These expenses do not include the $1,234 monthly payment that the Plaintiffs would pay if forced to repay their student loans.

[57] Doc. No. 56 at 7 ($1,150 for rent, $250 for electric, $80 for water, $240 for telephone/cable, $800 for food, $615 for car payments, $400 for gas/transportation, $200 for out-of-pocket medical expenditures, $225 for auto insurance, $600 for day care, $50 for clothing, $30 for home maintenance, and $100 for recreation).

[58] Mr. Kelly testified that the Plaintiffs do not pay $600 per month for day care during the 10-week summer session [approximately three months] that Mrs. Kelly stays home from teaching. $600 per month multiplied by 3 months = $1,800, divided by 12 months = $150 per month.

[59] *In re Bush*, 450 B.R. at 241.

[60] The Plaintiffs testified that they used private toll roads, as opposed to public roadways, which resulted in $110 in SunPass charges for February and March. Doc. No. 57, Exhibit 10; Doc. No. 65, Exhibit 11.

The Plaintiffs currently maintain two newer vehicles.[61] Although each vehicle's monthly payment is in excess of $300 per month,[62] the payments will cease in the near future giving them an extra $300 to $600 per month to pay toward their student loans.[63] The Court does not take issue with the Plaintiffs' decision to continue paying off the loan on the truck given the difficulty a debtor may face refinancing or obtaining a new vehicle after filing for bankruptcy. But once paid, the truck payments will stop. They will own the truck free and clear of any payment obligation. The lease on the Plaintiffs' second car also will end soon. If the Debtors truly need two vehicles, perhaps they can lease a less expensive model or buy an older car to further reduce payments. The Court specifically finds the Plaintiffs could significantly reduce their vehicle expenses by at least $300 per month while still maintaining a minimal standard of living.

The Court also finds that the Plaintiffs' $800 monthly food expense is high.[64] The United States Department of Agriculture lists the average monthly cost of a "thrifty" meal plan for a family of four as approximately $550.[65] One step up from the "thrifty" plan is the "low-cost" plan, which is commonly used by bankruptcy courts to determine a debtor's necessary food expenses.[66] The average monthly cost of a "low cost" meal plan for a family of four is approximately $700. Both plans assume that all meals are purchased at grocery stores and

---

[61] Doc. No. 65, Exhibits 5 and 6 (a 2011 Chevrolet Malibu and a 2009 GMC truck).
[62] Doc. No. 56 at 7.
[63] Doc. No. 65, Exhibits 5 and 6.
[64] No evidence was provided by the Plaintiffs to verify their monthly food expense. However, some of the food charges can be discerned from the Plaintiffs' debit card statement as provided in their Exhibit 10, while others can be discerned from a more complete copy of the Plaintiffs' same debit card statement as provided in Defendant DOE's Exhibit 11. Doc. No. 57; Doc. No. 65. When asked about their grocery purchases, Mr. Kelly testified that their average Publix bill could be anywhere from $200 to $300. A review of their debit card statement, however, shows that the Plaintiffs went to Publix nine times between January 2, 2013 and March 29, 2013, spending a total amount of $125.55. Plaintiffs also made 69 separate purchases at restaurants during that same time period, for a total of $901.48. Plaintiffs claim they only purchase "Dollar Menu" items when dining at fast food restaurants such as McDonalds, however, of the 35 purchases from McDonald's reflected on the debit card statement, nearly half of the purchases exceed $10, with as much as $27 spent at McDonald's in a single day.
[65] U.S. Dept. of Agriculture, *Official USDA Food Plans: Cost of Food at Home, U.S. Average at Four Cost Levels, May 2013,* available at http://www.cnpp.usda.gov/Publications/FoodPlans/2013/CostofFoodMay2013.pdf (July 2, 2013).
[66] *In re Ivory*, 269 B.R. 890, 904 (Bankr. N.D. Ala. 2001).

prepared at home.[67]  The Plaintiffs' reasonable food expenses should fall somewhere between those listed under the "thrifty" meal plan and those listed under the "low cost" meal plan. The Court will estimates $625 per month (as opposed to $800 per month) for food costs, which allows for an extra $175 per month that can be used to pay their student loans.

The evidence shows that the Plaintiffs, although certainly not living lavishly, have failed to disclose their current income or to minimize their expenses.  When their tax refunds (+$176 per month)[68] and their flexible spending account (+$416 per month)[69] are added to their income, the Plaintiffs earn $5,449.12 per month.  After deducting $175 per month from the Plaintiffs' food purchases, $150 per month from their day care expense, $200 from their gas purchases, and $300 for reduced vehicle expenses, the Plaintiffs have monthly expenses of $3,865, resulting in a net disposable income available to pay student loans of $1,584.12, which is enough to make their monthly student loan payment of $1,234.  Consequently, the Plaintiffs have failed the first prong of the Brunner Test.

Plaintiffs also have failed to meet their burden under the second prong of the Brunner Test, which requires them to prove that their current financial situation is likely to persist for a significant portion of the repayment period of their student loans.[70]  The evidence shows that the Plaintiffs' incomes are trending upward.[71]  Both of the Plaintiffs are healthy, educated, and employed.[72]  Both Plaintiffs have maintained employment within their chosen fields since obtaining their degrees.[73]  Although the Court is cognizant of the financial uncertainty that

---

[67] U.S. Dept. of Agriculture, *Official USDA Food Plans: Cost of Food at Home, U.S. Average at Four Cost Levels, Footnote 1, available at* http://www.cnpp.usda.gov/Publications/FoodPlans/2013/CostofFoodMay2013.pdf (July 2, 2013).
[68] Trial on the Plaintiffs' Amended Complaint, June 10, 2013.
[69] *Id*.
[70] *In re Cox*, 338 F.3d at 1241; *See also In re Matthews-Hamad*, 377 B.R. at 422.
[71] *See* Doc. No. 56 at 6 and 9.
[72] Doc. No. 56 at 9 and 11.
[73] Doc. No. 67, Exhibit 1.

necessarily stems from Noah's medical condition and is *very* sympathetic to the family's situation, courts do not discharge student loans under § 523(a)(8) because a debtor might have a precarious financial situation.[74] Plaintiffs have failed to show their current financial problems would persist for the majority of repayment period.

Therefore, even though the Plaintiffs have made a good faith effort to repay their debts, they failed to prove that they will not be able to maintain a minimal standard of living if forced to repay their student loans or that their present financial situation will persist indefinitely. Because all three prongs of the Brunner Test must be satisfied in order to consider a discharge of the Plaintiffs' student loans, the Court denies the Plaintiffs' request for relief. Plaintiffs' student loans are not dischargeable. The Court hopes, however, that the Defendants make any and all accommodations to assist this family in both paying their living and medical expenses as well as paying their student loans. I know the Debtors (as does the Court) would greatly appreciate any flexibility, forgiveness, or deferrals the Defendants can offer the Plaintiffs.

A separate final judgment in favor of the Defendants and against the Plaintiffs and consistent with this memorandum shall be entered.

DONE AND ORDERED in Orlando, Florida, on August 7, 2013.

KAREN S. JENNEMANN
Chief United States Bankruptcy Judge

---

[74] *See In re Douglas*, 366 B.R. 241, 256 (Bankr. M.D. Ga. 2007) ("Satisfaction of prong 2 should be based upon a certainty of hopelessness into the future, not simply a present inability to fulfill [a] financial commitment. A bleak forecast of the near future . . . is insufficient to demonstrate undue hardship under the second prong of *Brunner*.") (emphasis omitted) (internal quotation marks omitted); *see also In re Mallinckrodt*, 274 B.R. 560, 566-67 (S.D. Fla. 2002) ("[The debtor] must prove a total incapacity . . . in the future to pay his debts for reasons not within [his] control.") (internal quotation marks omitted).